Counsel, before you get started, there will be a change of panel after this case, so whoever is here on the second case, be aware there will be a break before we hear that. All right, you may proceed. May it please the Court, Sanford Weisbursch for Appellant Toray Plastics, America. With the Court's permission, I'd like to reserve three minutes of my time for rebuttal. Yes, you may have it. Thank you. May it please the Court, I'd like to start with the jury waiver question, which is a question of first impression in this circuit. And that question is whether a party, having deliberately waived its right to jury trial, can change its view based on a change in strategy some two years down the road. Now, the Tenth Circuit and a district court in the Sixth Circuit have both said that this is an impermissible reason for a belated demand of jury trial. And Judge Posner in the Olympia case explained why that should be the rule. And the reason is, if the parties are allowed to waive jury trial in the hopes of creating a forum for a settlement, and then if settlement looks unlikely to change the playing field by demanding a jury trial well into the case, it will actually make settlement less likely. And that would be a poor rule as a policy matter. And we respectfully submit that this Court should side with the Tenth Circuit and the district court in the Eastern District of Michigan, as well as Judge Posner's explanation, and rule that a party cannot, as a matter of law, belatedly demand a jury trial after deliberately waiving a jury trial. What was the prejudice to Toray from that change, specifically? Well, there was no prejudice. And we've conceded in our briefs, there's no prejudice in the sense of not being able to prepare for a jury trial. But there is prejudice in terms of making the prospects for a settlement less likely. And there's also prejudice to the this isn't our main argument, but as the case turned out, the issues in the case proved less amenable to resolution by a jury trial, because the jury failed to focus on the proper issues. But I want to stress that our main argument here is not based on prejudice. It's based on the requirement of a viable reason in the first instance, and the lack of such a reason here. But isn't this exactly the opposite situation, which is that you worked very hard with the magistrate judge to try to get this case settled. And the magistrate judge at some point said, you know, let's not go rushing into discovery. Let's try to keep the calm, keep the peace. That also is an explanation for why there was no jury trial. And in this circuit, it's an abuse of discretion standard of review. Yes, it is an abuse of discretion standard. We recognize that. That's the Rowlett case. However, Rowlett involved a situation of inadvertence, and this court has never yet addressed the question of a deliberate change in strategy. I'd like to move on to the question of the insufficiency of the evidence. Can I just ask you one quick, the argument that you just made to us about there not being a valid reason, was that argument made below? Yes, it was made below. However, the district court, in its opinion, did not address that aspect of the argument. The district court focused on prejudice. I'd like to turn to the question of insufficiency. And this jury's verdict was insufficient both in terms of liability and damages. I'd like to start with damages. Rhode Island law is clear that a plaintiff must prove its lost profits or damages with reasonable certainty. And there's many cases that establish that principle in Rhode Island. For example, the aid and maintenance case, which is cited in our reply brief, the George v. Burkander case, and Aren't many of the cases you cite antitrust cases as opposed to breach of contract cases? Well, no. Several involve, well, aid maintenance, for example, involves an employee of a cleaning business who is disloyal to that employer and solicited business for a different company. But the rule is clear in contract cases as well as other cases that damages must be proved with reasonable certainty. And here, there was a total lack of proof. As an initial matter, National Plastics is not allowed in a contract case simply to disgorge Toray's profits. That's clear from the George v. Burkander case. It explicitly holds that only in an unfair competition case can you simply disgorge. So what we're left with is National Plastics having to prove, and it's important to remember they were the plaintiff, they had the burden of proof here, having to prove some basis for estimation of its lost profits as a result of the alleged breach here. And there was a total lack of such proof. The focus, the only focus of National Plastics was on the sales of Toray. And there was a lack of a nexus between the sales of Toray and what sales National Plastics would have had. And I'd like to highlight one, among other things, there's numerous factors. First of all, Toray has many more employees. It has almost 700 employees in Rhode Island, whereas National Plastics has three employees in Colorado. Toray has a much bigger sales force than National Plastics. And most importantly, perhaps, Toray sells to an entirely different set of customers. Toray is selling domestically to companies like Frito-Lay that have exact specifications and receive warranties. And this is at A796 and A855, the evidence on the warranty issue. And why are warranties important? They're important because when you sell something with a warranty as opposed to National Plastics, which does not, under this contract, Toray sells to National Plastics explicitly without a warranty. That's A983, Section 1D of the contract. And National Plastics is selling to brokers who are in turn reselling overseas without a warranty. When you have a warranty versus not a warranty in a sale, the price is higher when you're selling it with a warranty. The purchaser is paying for the luxury of having a warranty that the goods that it's buying are going to meet its specifications. Was all of this put before the jury? Yes. I mean, the warranty issue, the warranty evidence that I cited at A796 and A855 is in the jury transcript. However, the I'm sorry. Yes. On the aged material, and don't get into your argument on that now, but just as to the warranty issue. Yes. Their claim was you were going to give them access to all of your aged material, which they would then sell. Well, why is warranty an issue here at all, given they were going to sell all of your aged product? Because the question is, let's assume that we were given, let's assume we accept National Plastics' interpretation of what aged film means. And I'll get to that later, but let's just assume that. There remains the question of what price it would be able to sell that material at. And that is a different price we submit than what Toray would submit, would sell it. Are there other sources than these two companies to buy the equivalent of the aged material? You can only get a higher price if there is actual competition out there. But if they're selling all of your product and you can't sell any of it, unless there's a third party to buy from, it's a bit of a skewed marketplace out there. Well, Toray has a bunch of established customers, including the Frito-Lay company that uses these highly specific plastic bags to package their food products. And those products have been sold to Toray. Toray did not have to share the customer relationship with Frito-Lay with National Plastics because it was a pre-existing relationship. The only requirement for sharing approaches was new approaches to Toray. But let me go back to the warranty question. So it's important to emphasize again how different these companies are. Toray is selling to an established market domestically, whereas National Plastics is selling primarily for foreign consumption. And even aside from the warranty, you can see this in the evidence. If you look at the stipulation that was submitted to the jury on what Toray's prices were for 13 months and older material versus what National Plastics' prices were. So at $769 to $770 is the stipulation. And you see from that that the average price that Toray is selling for is $1.82 per pound. By contrast, National Plastics, and this can be seen at $10.49, is selling in a range of not only a lack of evidence, but there was affirmative evidence in the record that the prices that these companies are selling this product for are markedly different. So this is what I'm missing, and maybe you can just help me with this. I thought the argument was that the damages claimed are speculative and not proved with sufficient certainty. But if all of this evidence was in front of the jury, then it seems to me what you really mean is that it's against the weight of the evidence, that the damages award is against the weight of the evidence. So what am I missing? Well, we've argued, first of all, both points, both that we're entitled to judgment as a matter of law and in the alternative that the verdict is against the weight of the evidence. The consequences of those rulings would be different. In one case, we would get judgment, and in another case, we'd get a new trial. But the fact that this evidence was before the jury, I mean, I'm citing some evidence here that actually proves why there was a lack of a nexus. But it's important to remember that National Plastics had the affirmative burden of proving a nexus. And if there's one case I can refer the Court back to again, it's the aid maintenance case. It talks about how you can't simply speculate that one party's profits would have been the other party's profits. Can I interject? My understanding of your argument is that what plaintiffs did below is prove the gross revenues that Torrey would have achieved from these sales. And I think your first level of argument is there's no reason to say that National Plastics' gross revenues would have been the same as Torrey's gross revenues because the market is different and they don't have warranties and so forth. And then I think the second layer of your argument is there was no evidence as to National Plastics' costs and therefore no evidence as to profits and the measure is lost profits and there was literally no evidence on that. Correct? I agree with that statement. We are arguing both a lack of a nexus on revenues as well as an entire lack of evidence on costs. We've argued both points. All right. And what about their argument that the failure to prove lost profits was waived below? Well, we explicitly argued at the 50A conference that there was a lack of proof on damages. Now, in candor, we were not quite as specific on the cost aspect, which is the second aspect. We believe our argument was sufficiently broad to sweep that in. I think, you know, the Court should keep in mind here that, you know, these sorts of 50A arguments are made sort of on the spur of the moment and we're here at the close of evidence. There wasn't an opportunity at the 50A stage to submit papers. We were able to submit papers at the 50B stage, but we believe that we did make a sufficient argument there was a lack of proof on damages such that both costs and revenues could be considered. I'd like to turn in the remainder of my opening argument to the age film issue. And I think here again, we're arguing both lack of an entire lack of evidence as well as against the weight of evidence. And the key here, it's a rather simple argument and it should be a simple argument for us to ask to overturn a jury verdict. And that is that the only evidence that age film means 13 months or older, which is what the jury apparently adopted, was from accounting contexts and sales incentive contexts. If the Court and if the jury looks Did you argue to the jury that because the evidence comes from the two other contexts, it's irrelevant in this context? Yes, and indeed we And the jury rejected the argument. The jury did reject that argument. However, again, we think that that was against the weight of the evidence here. And it's a rather clear legal principle with we respectfully submit because under the provisions of the restatement, for example, Section 202, the most important evidence is the evidence of what the negotiators thought. And there were only two negotiators here. There was Mr. Jose on behalf There's a long history between the two companies. And in that long history, it would seem to me a jury could find ample evidence to support this interpretation. Well, only if those other contexts could be imported into this context. And we respectfully submit that it can't. Because, again, the only evidence As a matter of contract interpretation, prior history between the parties is irrelevant? Well, no, it's not irrelevant. But there was no prior interpretation that weighed into the aged film notion. And in fact, there was subsequent performance under this contract. And there was an email exchange in February 2009 between Mr. Goderstadt and Mr. Jose where Mr. Jose explicitly offered Toure's interpretation of aged film. Mr. Goderstadt did not contest it. And that's course of performance evidence. Thank you, counsel. You've reserved some time. Thank you, Mae. Police, court, my name is Jim Ratzel and I represent National Plastics. I want to just pick up on the very last question put to opposing counsel because it's a very key element. These two parties had a longstanding relationship. The term aged goes back and forth. The reports that my client did, all discussing aged, in depositions of the Toure individuals. What about in the trial? Was there evidence at the trial? All of that came into trial. And it's all in the various exhibits. The emails came in the evidence. The reports from my client came in the evidence, all discussing aged. These two parties knew what they were talking about. They had a 20-year history. There was no surprises to the term aged. As a matter of fact, when you even look at some of the internal documents of Toure, you will see that they even reference aged. And the key element there is this chart that was introduced in the evidence where they specifically talk in terms of age. What got Toure in the trouble is at trial, before the jury, which everyone realizes is a real test of credibility, Toure started saying, well, we don't know anything about aged. That's only for accounting. The 20-year history didn't talk in terms of accounting when they used those terms. The standard before this court that Toure has is an immense one. They're trying to essentially retry this case. The jury heard all of the evidence. The standard is that a reasonable jury could not have returned a verdict. Now you compound on top of that Judge McConnell saying not only was there a small amount of evidence, there was ample evidence to support it. Judge McConnell was there to hear the witnesses and judge their credibility. Well, hold on. There's literally no evidence of lost profits. You agree with that, correct? And I think your only argument is that Toure waived it. There was no evidence of national plastics costs and therefore no evidence of lost profits as opposed to gross revenues. What we have is this, and I guess what I rely on, Your Honor, is they have a longstanding history of doing business with one another, and Toure had so much confidence in national plastics that they signed into this 17-year exclusive contract. There wasn't any doubt in Toure that they couldn't handle or they weren't up to the task. No, no, no. That wasn't the question. I mean, I understand you had the relationship, but the measure of contract damages is lost profits. In other words, you're not entitled to all the gross revenue that you would have received. You're entitled to the profits. You're correct, Your Honor. There was no specific testimony as to any specific profit. But one of the problems we had was we have no idea what this material consisted of. It was disposed of and sold to third parties without any notice to us. So we don't know if this was one huge roll of a million pounds of plastic or a hundred rolls of plastic. We have no idea. So even if we had been given the opportunity to say to the jury, here's what it's going to cost us, we necessarily were at a loss because Toure never provided that information to us. Well, wouldn't it have been very simple, Mr. I'm sorry if I'm getting his name wrong, but Gouderstadt? Gouderstadt, I'm sorry. Couldn't he simply have testified our profit margins are typically 25 percent or, you know, whatever the number is and our cost structure is X, and therefore you multiply however many million dollars of the gross revenue times 25 percent of that? Actually, they did do that indirectly, Your Honor, through that 12 percent commission. No, no, no. The 12 percent commission is what, as I understand it, and please correct me if I'm wrong, that's the measure of the revenues that National Plastic would have received. In other words, it gets to keep that as its gross revenues, 12 percent of each sales. But that's not evidence of its cost. Well, but out of that, no business is going to operate to drive themselves to bankruptcy. So out of that is going to be the cost of doing business, their cost of everything essentially. So it's all factored in. But again, we don't know if it would take a single phone call to sell this product or 10 phone calls or 1,000 phone calls because we never were given that information. I think when you look at the aspect of whether there was a breach, the breach was Sorry, let's go back to that. You're saying to us there was no way to figure out what the costs would have been for your client. Was that argued to the jury? Was this question of the difference between revenues and costs argued to the jury?  I don't believe there was any real substantive discussion of costs. Including by your opponent? Correct. Correct. I don't think we went down that road. And I think if we had gone down that road, some of these other issues would have been developed before the jury trial in terms of our lack of access to the product. We were not given customer names. We couldn't verify anything. So necessarily we were dealing in an abstract world. But the jury did reach a conclusion with reasonable certainty. You have to remember respectfully, this is an exclusive relationship. These parties have a longstanding history with one another. Torey had so much faith in my client that they gave him a 17-year contract that's exclusive. We know exactly what the product was because Torey sold it. We know that there were customers out there because Torey sold it. But before you get too far away from the Chief Judge's question, I just want to ask this. Part of your brother's argument, though, is that you have an obligation under Rhode Island law to put in some evidence of what those costs might be. Is that an incorrect statement of the law? I think you have to show with reasonable certainty. And I think based on the evidence in the case, we essentially met that burden. Could there have been other ways or more specificity? I suppose there could have been. So, not to put words in your mouth, but you're telling me that there is no obligation, no affirmative obligation for you to put in what your measure of what the costs might be that gets subtracted from the revenues? With that degree of specificity, that's correct. We did not. And we necessarily could not due to the limitations imposed by our not having the product. We had never been... That's a reasonable argument. But the mystery to us is why the issue didn't come up below in the trial court. I mean, you can say we can't prove it because they did not give us a discovery on that issue. We're impeded, Judge. But why is this issue coming up in the Court of Appeals rather than in the district court? Well, this goes back to the waiver issue that we've explained, that we contend that Tori has waived this issue. But also, more importantly, Mr. Goddard... Before you, more importantly, what was the waiver based on? The waiver was based on the fact that this was not raised during the trial. In terms of, Tori Goddard testified, if you've got me a product, I can sell it. And so we know of this long-standing relationship that's been going on. The jury can reasonably infer that, yes, there's all sorts of costs associated with the sale of this and business transactions. Well, what are those costs? He has salesmen. He has a telephone bill. If he has to make three telephone calls, he's got to pay for his phone. What were the costs? There was no evidence of that. The jury was not given those specific detailed costs. All right. Now, the jury had to be instructed on what it had to find. Was the instruction that you have to find lost profits? I honestly, Your Honor, with... I don't want to misrepresent the specific instruction. I don't know if it did specifically say lost profits in the instruction. I'm going to rely on Rule 28J. Each of you submit a letter to us on this point within the next 10 days. Very well. Mr. Ratzel, this contract involved a sale of goods, right? So the Uniform Commercial Code Section 2 applies. I didn't see any reference to it anywhere in the briefs or the trial. Does that make a difference that the Uniform Commercial Code of Rhode Island ought to apply to these transactions? I'm not sure. Based on what transpired, I would not think it... I don't see that as an issue. But you do agree this was a contract for sale of goods? Yes. And it was an exclusive contract within the meaning of the UCC? Right, for 17 years. I think what we have is throughout the trial there were various references to aged. There was the chart. There were statements by Tory witnesses. And there even were sales incentives. And what we have is the Tory executives even testified that if we sold this product to third parties, there would be a breach of the contract. So clearly we proved a breach of the contract. Two of the Tory executives testified that if they did sell, there would be a breach and then they admit, at least one of them admitted, yes we have sold this to third parties, which is in violation of the contract. Could we go back to the damages question? Sure. What is your response on the warranty issue? The warranty issue, it was a product that, number one, I'd have to recall... If the customers don't care about warranty, then the price differential argument goes away. I'm not sure that there were two, first there were no witnesses from customers that testified saying yes, I would only buy it if it was under a warranty. What you have, again, you have two sophisticated parties in this field. They know the market. They've been doing business for 20 years. They know exactly the product. They know where the customers are. Plus, if there are referrals that need to be made, it was even incorporated under the contract that Tory would refer potential customers to my client here. So as far as the warranty issue, there was not any specific testimony that I can recall saying that that's a key element. Now, there was reference, counsel made reference to Frito-Lay. That's not the same film that we're talking about. The Frito-Lay film is a completely different film than what we were talking about. My client did not get Frito-Lay film. So the type of warranty that he's talking about, there's no real testimony to my knowledge that that came into play in terms of whether there'd be a sale or not. You did not put on evidence that your customers, for the most part, don't worry about whether there's a warranty. Whatever the product is, my client sells everything from scrap to downgraded, to B grade to C. There may be products in there that a particular customer may say, well, I want this particular product. But otherwise, I don't want to guess, but my impression from the testimony is that a lot of the customers know exactly what they're dealing with because they've dealt with my client and with Torey for years. I'm sorry. Isn't the question really Torey produced gross revenues of, I think, close to $17 million, and under the contract you would have had a holdback or a retention or whatever it was called of 12%. Correct. That's $2 million ballpark. Right. And your argument is that National Plastics gross revenues would have been exactly the same as Torey's, which is fine if there's evidence to support it to show that's a comparable situation and so on, but don't you have to address things like the size of the company, the number of salespeople, the warranty, the market? Do you know why I don't think he would respect me, Your Honor, is because, yes, my client is a little guy in the picture. Torey's huge. But my client was successful in getting Torey to give my client a 17-year exclusive contract. That shows the confidence that Torey had in my client. Plus, my client, this is a longstanding relationship. There was absolutely no testimony that during the course of this relationship, my client did not fulfill orders or there were mix-ups or problems like that. And it's like any other business. The jury can reasonably infer if suddenly a business sees their business developing, they can hire more people or they can relocate. That's the nature of any business, and I think the jury understands this. That's why we have juries with their common knowledge saying this is a business relationship. Both sides are working well together. They should work well together. And there was never any testimony that my client was unfit or could not comply with the contract. All of that is fine, but it doesn't seem to have anything to do with the difference between revenues and profits. Well, it does in a sense of the question put forth to the jury was, was my client damaged and how much was that damaged? The damage was not an emotional decision, an irrational, they didn't award $10 million. They said the parties worked out that my client would get 12%. Remember, we knew the product. We knew the customers. We knew there were sales, and we knew the dollar amount of the sales. That was all undisputed because of that stipulation. And we knew it was sold to third parties. We also know that Torrey had a contractual obligation to give us sales leads. So in the event Torrey found a customer, they would take 50,000 pounds. They would put us there. So you do have knowledge and sufficient evidence of sales, of what the 12% comes from those sales. Now, is it precise to the penny? No. My client maybe could have sold it for more, maybe could have sold it for less. But the jury only has to do a reasonable certainty. And admittedly, there's case law which identifies it's not a precise certainty. And this is a classic case in which the jury was properly instructed, reviewed all of the evidence, and was able to make a fair and just determination. I have six seconds left, so essentially I'm done. If there's any other questions for the client, I'd be happy to answer them. Otherwise, I can... You've used the six seconds. Thank you. I'd like to start with the warranties point. I think there's no dispute that Torrey sells with warranties, National Plastics doesn't. I want to go back to Chief Judge Lynch's point during my opening argument, which is, well, what sort of competition is out there, and maybe National Plastics would charge the same price if Torrey's out of the picture. That may well be, but there was no proof of that. And really, there had to be some proof. I mean, that's sort of an economic theory in the abstract, and it may be valid, it may not be, we just don't know. I appreciate that you finally answered my question. Okay. I'd like to also point out, again, on the cost point, I don't think that there's any dispute here that cost was not raised, that it is an essential requirement of Rhode Island law, and that the judgment should be reversed on that basis alone. Well, you have some obligations here. Your argument seems to depend on they have the burden of proof. Why didn't you say to the trial judge, you know, lost profits is the appropriate measure. That's what you have to instruct the jury on. It's an issue in this case. Well, you know, we will address this point in further detail in the 28-J letter that Your Honor has asked to submit. No, no, no, no, no. You misunderstood me. Rule 28-J is a single reference to what is in the record below. It is not argumentative. You've had your chance to make arguments. Understood. We will strictly report what the instruction was without comment. But so was there discovery on cost? There was not extensive, if any, discovery on cost here, and we would respectfully submit that it wasn't our burden as a defendant to do that discovery. It was their burden as the plaintiff. And how are you going to challenge, if you say they had an affirmative obligation to put in evidence about cost, how are you going to challenge that if you didn't do any discovery on it? Well, we would challenge it by saying that it was their burden to put it in. How were you going to challenge it in preparation for trial? Well, we would have at least. I know it wasn't you, but. Well, we would have at least known what their proof was, what their theory of what the costs were, and been able to examine that and see whether it was valid or not. So it's kind of, I'm not trying to avoid the question, but it's hard to say in the abstract. On the question of sales leads, okay, which is another way that National Plastics is trying to link Toray's revenues to what revenues it would have earned, there was only, and again, the burden is on National Plastics here, there was evidence of a single sales approach. This is at A567, and that approach was by a guy named Steve, who cold called Toray, did not result in a sale. The record is essentially devoid of any proof of approaches that should have been shared. And finally, on the aged film issue, the important thing, understanding the background context, is that the term aged film was not used. Aged might have been used, but not aged film. That term was inserted only a week before the settlement agreement was signed. There was not a meeting of the minds on that. Thank you. Thank you.